Blue-Jacket v. The Commissioners of Johnson County and others.

*Error from Johnson County.*

3  299
56  555

Under the constitution and laws of the state, all the property therein, not specifically exempted, is subject to taxation. The lands of the united tribes of the Shawnee Indians held in severalty, are included unless controlled by exemptions in a paramount law.

The Federal Constitution, laws of the United States and all treaties made under their authority, are the supreme law controlling organic acts and state laws in this as in the Federal Courts, despite any notions of state sovereignty.

If the title to the lands in question be in the United States, they are not taxable,—this under express stipulation, [*Ordinance of State Constitution,*] and *semble,* without such stipulation. That irrevocable ordinance is merely the expression of what the law would have been without it.

Blue-Jacket v. The Commissioners of Johnson County and others.

Where a district of country is held in common by an Indian tribe with or without patent in fee simple issued pursuant to treaty, which does or does not give the government alone the right to purchase from them, *held* that such tribe holds the mere right of perpetual possession and enjoyment,— this though the words of the treaty or patent as between *individual* Indians or whites, and the government be sufficient to convey absolutely.

The test of absolute conveyance as to Indians, taking in severalty, is the intention of the parties evidenced by provisions of patent and treaty, considered in the light of existing circumstances.

The policy of the government has been to civilize the Indian; a policy visible in the treaty with the Shawnees of May 10th, 1854. For a third of a century prior they had lived on the borders of civilization in contact with whites; a portion had adopted the manners and habits of civilization, others not. In the territory ceded by that treaty the former class occupied cultivated farms therein, the remaining lands, more than sufficient for agricultural uses of the whole tribe constituted a waste in the most desirable part of the territory about to be opened to settlement by whites. By that treaty was ceded to the United States the whole Shawnee reservation of 1,600,000 acres, of which the government re-ceded to the Shawnees 200,000 acres, and promised $829,000; the Indian selections to be made within thirty miles of the Missouri line. It was competent for the Indians to have selected the whole in a compact body, and held the lands in common; *Semble*, had they done so, no patents would have issued, and they would simply have taken the "Indian title."

The treaty provides "Congress may hereafter provide for issuing to such of the Shawnees as may make separate selections patents for the same, with such guards and restrictions as may seem advisable for their protection therein."

The congressional action contemplated, is found in act of March 3d, 1859, authorizing the Secretary of the Interior to cause patents therefor to issue upon such conditions and limitations and under such guards or restrictions as may be prescribed by the Secretary.

The Government assented to the selection of lands by some, in severalty; when so selected, the title of the tribe, of perpetual use and occupation thereto vested in the Indian selecting. *Semble*, had it been intended that he should not acquire a greater title, further provision would have been unnecessary, but in addition, patents might be issued.

The object of this provision, *semble*, was not to enable the government to convey the ultimate title; it could do that without consent, but *held* that it was to bind, and the government was thereby bound to nothing except that *when* it patented it should see that the Indian was properly protected.

Five years after, [March 3d, 1859,] Congress provided for issuing patents to those holding in severalty, the object of which patenting was to convey the ultimate title, and which in terms conveyed the lands in fee simple, and contained a restriction "that said lands shall never be sold or con-

Blue-Jacket v. The Commissioners of Johnson County and others.

veyed by the grantee or his heirs without the consent of the Secretary of the Interior for the time being."

*Held* that the restriction in the patent does not operate as a condition, because a violation thereof does not affect his title, nor as a limitation on his title for the whole title of the government by the patent passed, but *held* that it operates as a personal disability, similar to that of a minor which the government was competent to impose.

The tribal organization of the Shawnees is still maintained, not however as to control lands patented to its members in severalty. The selections of such, made as by treaty stipulations they might be, are not contiguous, but widely scattered and interspersed by lands of whites, and it was contemplated that the patentees might dispose of some of their lands.

There is no express prohibition against taxing these lands, or the personal property of the Indians residing upon them. In disposing of the lands to these Indians, *semble*, it was competent for the government, under the constitutional power to make needful rules respecting the territory and to regulate commerce with the Indian tribes, to have prohibited taxation by the state, of these lands, at least while remaining the property of members of the tribe.

The treaties made with Indian tribes under the administration of Commissioner Manypenny, may be divided into *first*, those with no restrictions; *second*, those prohibiting alienation without assent of government; *third*, those exempting lands from levy, sale, execution or forfeiture; and *fourth*, those which in addition, exempt the lands from taxation. In the last class the word "taxation" is added to the terms expressing the exemption used in the preceding classes. The treaties of the first three classes had been negotiated prior to the drawing of those of the fourth. The word "taxation" used in the fourth class was intended to prohibit what had not been provided against in the other classes. Exemption from alienation therefore, was not intended to include exemption from taxation.

The Secretary of the Interior, having the power and not having inserted the word "taxation" in the clause of exemptions, *held* that it was not the intention that these lands should be exempt from taxation. [*Lowry* v. *Weaver*, 4 *McLean*, 82.]

The general government never recognized the Shawnee tribe as a distinct nationality, except in connection with the country they occupied, and as occupying exclusively a particular district of country.

The suit in the court below was instituted for the purpose of obtaining an order restraining the defendants from selling certain lands of the plaintiff's for taxes, and to recover judgment for taxes already paid. The petition which was filed in behalf of Charles Blue-Jacket and all other Shawnee Indians owning lands in Johnson county, alleges

that he and those for whose benefit the suit was brought, are members of the united tribe of Shawnee Indians. That said tribe for a long time prior to the organization of the territory of Kansas, had, and since until now, have resided upon the tract of land of which those described in the petition constitute a part. That during all that time they have, and still do keep up their tribal organization in said county, being an independent nation, having their own laws, usages and customs; are governed by their own council, regulate their domestic affairs in their own way, and have, ever since the organization of the federal government been recognized and treated by the United States as an independent nation. That under the treaty of May 10th, 1854, the members of the tribe became entitled, out of the lands ceded by the treaty, if single persons, to two hundred acres each, and if heads of families to an amount equal to two hundred acres for each member thereof, for which lands, when selected, they were entitled to patents to be issued when Congress should make provision therefor, which provision was made by the act of March 3d, 1859. That at that time, and at the date of the treaty, the plaintiff was the head of a family consisting of himself and five others. That he selected the lands described in the petition and obtained a patent therefor, with the restriction prescribed by the Secretary of the Interior, under the act of March 3d, 1859, therein inserted, that said tracts shall never be sold or conveyed by the grantee or his heirs without the consent of the Secretary of the Interior for the time being. That the county officers of Johnson county have levied upon said lands the ordinary state, county and other local taxes, and are about to sell the same for the payment thereof. That they levied taxes upon the personal property of the plaintiff and threaten to sell that, and that they have done and threaten to do the same things with reference to the real estate and personal property of the other members of the tribe in said county. It

is alleged that they never have surrendered to the United States nor to the state of Kansas their national existence and the right to regulate their own affairs in their own way. That they never surrendered to the state of Kansas the power or the right to tax their lands or other property, and they deny the lawful power of the state to tax their property. It is also alleged that a large portion of the tribe reside in Johnson county, and that their chiefs and head men reside, and their council, for the transaction of all their business, meets therein.

The prayer of the petition is for an injunction to restrain the collection of the taxes so levied as aforesaid, either by the sale of the lands or the personal property of the Indians, and for a judgment for the amount of the taxes already paid by them.

To this petition the defendants filed a demurrer, assigning as the ground thereof that it did not state facts sufficient to constitute a cause of action, which demurrer was sustained and judgment for costs rendered against the plaintiffs.

The case was then brought here, where that judgment was reversed, and the cause sent back for further proceedings.

In an answer filed by leave of the court, the defendants say "that except as hereinafter stated, they admit plaintiff's petition to be true, and as to those matters they deny said allegations." They allege that at the date of the treaty, viz: May 10th, 1854, the Indians held and used in Johnson county, but without the fee simple thereto, about two hundred and sixty thousand acres of land; that by that treaty the Indians ceded all their rights to said lands to the United States, in consideration whereof the United States ceded to each single person two hundred acres of land in fee simple, and to each head of a family, a like amount for each member thereof, to be selected by the grantees out of the ceded lands; that after the lands

were so selected, patents in fee simple were issued therefor in accordance with the act of March 3d, 1859, under which patents the grantees held the lands absolutely, subject only to the restriction that they nor their heirs should sell or convey them without the consent of the Secretary of the Interior; that the aggregate of the lands so selected is about one hundred thousand acres; that the lands so granted and patented do not lie in a contiguous or compact body, but are scattered over the entire area of the lands ceded by the Indians to the United States, and are interspersed with the farms and lands, and are within and governed by the school and road districts and municipal townships of the white citizens of said county; that said selected lands are in fact scattered all over the body of said county and are traversed by white citizens as well as Indians in visiting each other, going to mill and various business centres of said county; that highways have been laid across them by the different tribunals in the county, and frequently at the request of the grantees; that since the lands have been patented to the Indians, many of them have been sold to white citizens, upon which the latter have made and occupy valuable improvements; that the Indians trade and trafic with their white neighbors as they do with each other, and as the latter do with each other; that many of them have intermarried with the whites, and that their marriage ceremonies conform to the laws of the state; that many of said grantees are white men and women, the former of which are entitled to and do exercise the elective franchise at all elections in the county; that the Indians appeal to the courts of the county for the protection of their rights as well against each other as against the whites; that offenders among them are brought by them before said courts for trial and punishment, and that they invoke the aid and shield of the laws, courts and institutions of the state as administered in the county, to protect rights, re-

dress wrongs, preserve order and maintain justice among themselves and their white neighbors. That they are entitled to the benefits of the school funds and do use the common schools. That on the decease of any of them their estates are subject to the state laws concerning descent, inheritance and distribution, and are in fact administered upon and disposed of by their request in the Probate Court of the county. That many of them have paid taxes into the treasury of the county, and that commercial business and social intercourse prevail throughout the county between the plaintiffs and the citizens and residents of the county. The defendants deny that the Shawnee tribe of Indians are an independent nation, having their own laws, usages and customs and their own independent government, or that they are so treated and held by the general government, but allege that the patented lands are not under the tribal control, and are the individual property of each patentee. That upon those parts of these lands purchased by white citizens, farms have been made and improvements erected which are occupied by the owners who are living in neighborhood with the patentees the same as though they were white citizens. The defendants deny that the patented lands or the personal property of the Indians are exempt from taxation, or that the state has no rightful power to tax them, or that the taxes levied thereon are illegal and without lawful warrant or authority. They also deny all the allegations of the petition not admitted by the answer.

To the answer, the plaintiffs filed a general reply denying its allegations.

The cause was submitted to the court for trial, and the bill of exceptions shows the following testimony to have been introduced.

Charles Blue-Jacket, plaintiff, testified that he is and always has been a member of the united tribe of Shawnee Indians; that he selected his head rights under the treaty

39

of May 10th, 1864, and resides thereon; that he is the Shawnee Head Chief and has held that position four years next New Years; Graham Rodgers held that office before me for about two years; Pascal Fish, a Shawnee, was his predecessor for about one year; Capt. Joseph Parks was his next predecessor for about six years. Graham Rodgers is now second chief of the tribe. The Shawnees have a council of five men, elected for one year; they have a sheriff elected for one year and a clerk of the council elected for one year. The Shawnees have an interpreter for the tribe, appointed by the government of the United States; Mathew King, a Shawnee, holds that place at present. The Shawnees have a place for the meetings of their council and head men for transacting business, which at present is a vacant house on my premises owned by me as a head right. I am forty-eight years of age. The Shawnees keep up the same organization now that they always did within my recollection. The number of the Shawnee Indians belonging to the tribe is about 860, exclusive of absentees, of which there are between 1,100 and 1,200. The Shawnee council meets at a stated time—the first Monday in every month. The powers of the tribe in council, are regulated by custom. This tribe have their own customs and their own regulations, by which they are governed. We have customs governing the commission of offenses by one Shawnee against another. The council try the offender; the head chiefs carry into effect the decision fixed upon by the council. One case of murder has been so tried, the defendant found guilty and the punishment fixed by the council was death; The sheriff executed the sentence; This was in 1856 or 1857. This custom of trying offenders is still kept up. We have a national school fund and a school fund of our own. The interest on the former is $5,000 per year. We have the mission school under the direction of the Friends or Quakers. The old Shawnee misssion school was done away with some two or

three years ago on account of a non-compliance with con-
tract; the Sunday school there is kept up. If one Shaw-
nee is indebted to and refuses to pay another Shawnee,
the latter complains to the council who order their clerk to
issue a writ notifying the defendant to appear at the next
regular council day. The council hear and determine the
case and order the party to pay, which might be taken
out of the next annuity. The last annuity due from the
government was paid in 1863. The United States has an
agent for us, residing among us as has always been the
case. Mr. Abbot is the present agent. The Shawnees
have a treaty pending with the government, signed by our
head men in 1863, which is at Washington and not yet
acted on by the Senate. I was one of the delegates to
make the treaty. The head men or chiefs get their offices
by vote of the Shawnee people over seventeen years. L.
Flint is our present sheriff. We meet-at a vacant house
on my land, where we have met for six months; we have
been in the habit of meeting at different places. When
the agent calls a council, we meet at De Soto where he
resides; we formerly met in a church at Shawneetown;
we have met at Tucker's, at Capt. Kuler's building and in the
parsonage. No change in regularity of the meetings for
several years. Sometime five years ago we had a written
book, used eight years, showing the powers of the council.
We have punished no man for crime since the one re-
ferred to. Crimes have been committed since. I don't
now remember when the last debts were passed on by the
council—not since 1856 or '57. The man against whom the
penalty of death was found was David Daugherty. H. Car-
penter was killed at his house by C. Barnett. For stealing
we make the guilty party pay double the value. We have
tried no case of stealing within my recollection. Shaw-
nees do not steal much. We try to do in our organization
just what we have always been doing. We don't owe
much. The debts were all settled up when the big pay-

ments were made by the government. The members of the council get pay. The Shawnee council do not pretend to control my property—ponies, grain or head rights. There are six or eight adopted Shawnees among us. Some whites have married Shawnee women. They do not tax a poor tax among us. Our council never grant divorces. A Shawnee can divorce his own wife if he has any fault to find. Sometimes Shawnees are married by ministers. The adopted Shawnees live on patented head rights. There are two Quaker families at the Shawnee school, and $5,000 is given them annually to keep up the school; I send my children there; forty-five or forty-six children attend. There are three hundred children among the Shawnees. George Daugherty had the head right first of the land where Carpenter was killed; Carpenter sold to Elledge with approval of the Secretary of the Interior, and he sold to David Daugherty who was living there at the time Carpenter was killed.

I can sell my land or any part thereof without consent of the Secretary. In selling, we have to comply with the regulations of the Secretary. We had a custom in old times as to marriages; this custom still prevails among a portion of the tribe, and among another portion the most get married by ministers. The Shawnee council still recognize those who are married according to the old custom as man and wife. The council let the Shawnees do as they please as to marriage. As to heirs in the first place, they go to the council if there is any question as to who are heirs, and the council investigate and decide who are heirs; the two chiefs certify to it. When Shawnees die they go to Probate Court and get administration. In two cases the council made sale of personal property of deceased Shawnees and put the funds away for the children; these were very small estates; they sold personal property about one year ago. Some of the Shawnees have sold part of their head rights to whites who have settled thereon

and improved the same. Roads are laid out through our head rights by county and state officers. These lands can be sold to whites on permission of Secretary of Interior. On lands so purchased, whites have farms, farm houses, orchards, school-houses, and the Shawnees and whites live together as neighbors and friends, trafficking with each other. They hire each other to work.

Samuel M. Cornatzer testified that he had been a resident Shawnee by adoption, since 1847; received eight hundred acres as head rights; has been clerk of the Shawnee council since 1856, during which time difficulties have been settled, personalty of deceased Shawnees sold and debts paid by the council. It takes cognizance of offenses committed by one Shawnee against another. Charles Blue-Jacket is our minister and head chief. The more enlightened portion of Shawnees go to him for marriage. He has a ceremony of his own. Some marry by the old custom—either mode is considered valid. We keep a record in the council of all transactions relating to orphans, property of deceased Shawnees, &c. On conviction of stealing, the value of the thing stolen is paid to the owner, and a like sum paid into the council fund. Not many cases of this kind since I have been clerk. There was one case where a Shawnee was charged with manslaughter, found guilty by the council and sentenced to one hundred lashes, to be expelled from the tribe and to lose his annuity. That sentence was not executed owing to opposition of some of the head men. This was in 1860 or '61, just before the war. The defendant went into the service. The last estate settled by the council was that of Eliza Flint who died in 1864. She had but few things to administer on. There is one estate not yet settled up—that of Wm. Rodgers, who died in the fall of 1864. The council do not order the sale of real estate and do not take control of lands. I am administrator of the estate of James Suggett, deceased Shawnee; the estate is in Probate Court of John-

son county, There is one minor, and I am the guardian by appointment of Probate Court. I was curator of an incompetent Indian, appointed by Probate Court of Wyandotte county. We sell head rights to white men. * * * I never voted under other than Indian laws but once, and that was when the Missourians came over to vote. I thought I had as good right to vote as they had. I have never voted since this was a state; never witnessed an Indian marriage according to the old custom. We are a church body alone, not connected with any other church. There are state, county and town roads laid out through Shawnee lands—one through my land—by the county. The last man fined by the council was in 1863, for stealing; a number of persons have been punished within five years. I sent my children to Mr. Blodgett to school and paid him for it. A number of Shawnees voted at the election for county seat in 1858. Shawneetown was a candidate. I was judge of township election in 1863.

In the case of William Fish, arrested for shooting Robert Blue-Jacket, by sheriff of Johnson county, the council directed me and the Shawnee sheriff to demand him of the sheriff of Johnson county, to be delivered over to the Shawnee council for trial, which was accordingly done. Both were Indians; this was in 1858. In the fall he was tried by the council and acquitted.

Wm. Holmes testified: In 1858, I brought suit on a note owned by one James Suggett, an Indian; case dismissed by the District Court of the territory, on the grounds that the plaintiff was an Indian. I lived in Shawneetown; most of the claims I had against Shawnees were collected through the council. Sometimes the council would refer me to the courts of the state in disputed cases. After annuities ceased the council refused to settle claims or to administer estates.

Isaac Parish testified: I am a Shawnee by adoption, a resident, and have been since 1849; in spring of 1858, I

Blue-Jacket v. The Commissioners of Johnson County and others.

was sent for as a person to try Wm. White for murder; I was one of a jury of twelve; Pascal Fish was head chief, and present; we brought in a verdict of murder in the second degree. Previously, I had seen punishment—thirty-nine lashes inflicted on Black-fish, a Shawnee, for an assault with intent to commit a rape on a Shawnee woman. I saw Tom Daugherty hung by order of the council for murder in 1857.

I received as head of a family eight hundred acres of land under the treaty; I was sheriff of Johnson county in 1855, '56; I vote when I desire; can't say I have voted most of the time since 1858. I send my children to my own school. I tried to get a school district in my neighborhood. One third of the land in the district belongs to Shawnees. My own are the only Shawnee children that go to the school; I hire the teacher myself. I have seen no punishments since 1857 or '58, but have seen fines inflicted for minor offenses. All the business I have done with Shawnees I have done in Shawnee courts. I have paid some of the taxes on my land to keep it from being sold. Shawnees agree to live together as man and wife and are considered married as long as they live together.

I was born in Virginia, moved to Ohio young and came here in 1846. I never considered my being adopted as a Shawnee took away my right to vote.

J. B. Abbot, Shawnee agent, testified: My office is at De Soto, Johnson county; I think there are 99,728 acres selected head rights of Shawnees in this county. The Black Bob land held in common, is about 33,392 acres. The United States have been treating with the Shawnees since I have been agent—four years. There was a treaty signed by the Shawnees in 1862 and sent to Washington; not approved by the commissioner; returned, and a draft of a treaty sent out with instructions for me. This draft was recalled by the commissioner August 6th, 1862, and another draft treaty sent December 29th, 1862, signed by

Dole, commissioner, and Mix, chief clerk. This was laid before the Shawnees, filled up and signed, and in January 1864 a delegation of Shawnees went on with the treaty to Washington, and it was remodeled in Washington and signed by the delegation and the commissioner, and sent to the President and is now pending in the Senate for ratification. I transact my business with the Shawnee council and the head men of the nation. I follow the "printed instructions" as to miners and others embraced therein. I am clerk of the school district in which I reside; no Shawnee children are now sent there; Mathew King's were in 1862, and he, living out of the district, paid his schooling. I have heard Mathew King say he was a foreigner and had declared his intentions to become a citizen and claimed the right to vote. I send all estates to Probate Court in the different counties when the parties so desire; this under instructions from the department. The Shawnees have sold about two-thirds of what land they are permitted to sell.

Map of lands showing selections of Shawnees under treaty of May 10th, 1854, with the head rights, the Black-Bob tract held in common, the absentee lands and the boundary lines of Johnson county, indicated thereon, and showing the government lands open to white settlement, and also the townships and municipal township lines.

The following were also introduced in evidence:

"Rules and regulations to be observed in the execution of conveyances of lands which have been or shall be assigned in severalty to Indians within the territory of Kansas, and for which patents shall be issued in conformity with the 11th section of the act of Congress, entitled 'An act making appropriations for sundry civil expenses of the government, for the year ending the thirtieth of June, eighteen hundred and sixty,' approved March 3d, 1859.

"Individual Indian reserves are divided into two classes —those which are, and those which are not included

within the boundaries of a tribal reservation. The former are inalienable except to Indians by birth, members of the tribe to which the reservee belongs; the latter are alienable under the following conditions:

" 1. The deed or instrument of conveyance must be executed in the presence of two subscribing witnesses, and acknowledged before the agent, within the limits of whose agency the reservee resides, and, when presented for approval, must be accompanied by the following certificates, viz:

" 1. A certificate signed by two of the chiefs of the tribe to which the reservee belongs, setting forth that the grantor is the identical individual to whom the land was originally granted, or, in case the original reservee be dead, that the grantor or grantors, as the case may be, are the only heirs surviving of the original reservee; that he, she, or they, as the case may be, are severally of age, and competent to manage his, her, or their affairs, and to dispose of his, her, or their property; and that they think it advisable that the land should be sold.

" 2. A certificate from the agent for the tribe to which the reservee belongs, that the contents, purport, and effect of the deed of conveyance were explained to, and fully understood by the grantor or grantors, that the consideration specified therein is a fair price for the land; that the same has been paid to the grantor or grantors, in his presence, in gold or silver coin of the United States, and that the conveyance is in every respect free from fraud or deception.

" 3. If the original reservee be dead, and the conveyance is executed by fewer than all his or her heirs, then, in addition to the certificates above required, with the necessary changes therein, the conveyance must be accompanied by a properly authenticated copy of judicial proceedings, showing that partition of the lands granted to the original reservee has been made by a court having jurisdiction thereof; and a diagram prepared by a competent surveyor,
40

showing the lots into which the original tract has been divided, and the respective owners of the same.

"2. Lands belonging to an incompetent, if an adult, may be conveyed by a curator or conservator, and if a minor, by a guardian; in which case the conveyance must be accompanied by a certificate of two chiefs of the proper tribe, as to the identity and the incompetency of the grantor, and that the sale is advisable; a certificate of the agent for the tribe to which the incompetent belongs, that the consideration specified is a fair and just price for the land, and has been paid in his presence, to the grantor, in gold or silver coin of the United States, and that the conveyance is in all respects free from fraud; a properly authenticated copy of the records of a court having jurisdiction, showing the appointment of such curator, conservator, or guardian, as the case may be, and a like authenticated copy of judicial proceedings in a court having jurisdiction, authorizing such curator, conservator, or guardian to make sale of the lands mentioned in the conveyance.

"3. If the reservee (or in case he may be dead, his heir or heirs) do not reside within the bounds of an Indian agency, the deed of conveyance may be acknowledged before a justice of the peace, or other officer having legal jurisdiction, and, in lieu of the certificates of the chiefs and Indian agent in other cases required, must be accompanied by a certificate of the officer taking the acknowledgment, of the facts required to be certified by the chiefs and agent in cases where the grantor resides within the bounds of an Indian agency; or if such facts shall not be known to the officer, they must be verified by the affidavits of at least two credible persons who are cognizant of these facts, whose veracity must be certified by such officer, and the testimony and all papers pertaining to the conveyance must be properly authenticated under seal. In all other respects the conveyance must conform to the rules above prescribed.

Blue-Jacket v. The Commissioners of Johnson County and others.

"4. A diagram prepared by a competent surveyor, or an authenticated copy of the official plat of survey, indicating the land intended to be alienated, and all former sales by the original reservee, his or her heirs, must be furnished for the use of the Indian office.

" 5. No reservee will be allowed to sell more than one half of the land assigned to him (or her) under treaty stipulations, except in special cases, where circumstances to be determined by the Secretary of the Interior, may seem to require a relaxation of the rule.

" 6. No sale or conveyance which does not substantially conform to the foregoing regulations, will receive the approval of the department."

"DEPARTMENT OF THE INTERIOR.
Office Indian Affairs, May 27, 1861.

" The foregoing rules and regulations, designed for the government of the respective parties in the execution of deeds of conveyance pertaining to the alienation of lands assigned in severalty to Indians within the state of Kansas, are respectfully submitted to the Secretary of the Interior, with a recommendation that the same may be approved.                   WM. P. DOLE, Com'r."

"DEPARTMENT OF THE INTERIOR,
May 27, 1861.

" The above rules and regulations are hereby approved, as recommended by the Commissioner of Indian Affairs.
CALEB. B. SMITH, Sec'y."

It was also admitted that Charles Blue-Jacket is a Shawnee residing in the county of Johnson ; that he selected as his head rights under the treaty of May 10th, 1854, the said lands described in the petition, and that said selections were approved of as provided for by the treaty of the United States, and that a patent was issued to him for the same, as in said petition set forth ; that the defendants have assessed said lands, and the lands or head rights of all the

members of the Shawnee tribe residing in said county, and caused said lands so held to be taxed as in said petition set forth, and that said defendants have levied taxes on the personal property of said plaintiff and those for whom he sues, under the laws of the state of Kansas, the same as on personal property of the citizens of the state residing in said county, and the defendants claim the right to collect said taxes levied on said head rights and personal property, as in the petition stated, and are proceeding to collect the same as in said petition stated.

D. G. Campbell testified that he resided in Shawneetown in this county, that he is clerk of the school district board in his district, have been connected with the district as teacher or clerk for the three years last past; a portion—sixteen—of the Shawnee children of the district attend the school; they are enumerated and draw common school fund the same as whites. I know Wm. Donaldson, Fred. Chouteau, M. P. Randall, to be adopted Shawnees; they always vote at school and all other elections. Roads are laid out through the Indian lands on petition of Indians as well as whites; they also remonstrate against such laying out of roads. When I was in the legislature, I presented a remonstrance signed by Shawnees against a road being laid out. I am a minister of the Gospel; have married Indians according to custom of christians; as justice of the peace, have issued executions on judgments on my predecessor's docket in favor of whites and against Indians,—suits brought by whites. The wives of adopted Shawnees are Shawnee women. In a district within a radius of about four miles about Shawneetown, about two-thirds of the lands that Shawnees can sell have been sold to the whites; * * * the remaining lands are largely enhanced in value by the improvements put upon intervening lands by the whites to whom the Indians have sold * * *; the whites cross and re-cross Indian lands; the most valuable improvements have been made on those

head-right lands purchased of Indians; school districts embrace Indian lands as well as those of whites, and the same is true of municipal townships.

It was shown by L. F. Blodgett, Probate Judge of Johnson county, that he had granted letters of administration on those Indian estates; have appointed fifteen Indian guardians for Shawnee Indian children at the instance of Shawnee relatives or friends, and the records of the court show administration of those other Indian estates. Two-thirds of the lands sold by guardians are by Shawnee Indians, and one-tenth of all probate business is by Shawnees. In addition to the children of Shawnees mentioned by Cambell as attending the common schools, are those of John Parks, George Daugherty, Henry and Robert White, —all enumerated to draw funds the same as white children. Two-thirds of the improvements in witness's neighborhood are of Indians, but whites are improving lands bought by them of Shawnees. The best lands are retained by the Shawnees, as to improvements, location and value. He knew of all the adopted Shawnees voting at the different elections.

The following petitions for roads running through the lands of Shawnee Indians as through those of whites, were testified to by F. E. Henderson, county clerk. Petitions read in evidence:

1. Road petition signed by the following Shawnee Indians,—Graham Rodgers, John Parks, John McClane and James McClane, for a road through Shawnee lands.

2. Bridge petition for bridge on Shawnee lands, signed by M. King, Shawnee interpreter, besides thirteen other petitions for roads, bridges, dram shops, townships, and voting precincts on Indian lands, signed in the aggregate, with twenty-six names of Shawnee Indians, either by birth or adoption.

The witness also produced the marriage records of his office, showing records of twenty-three marriages of Shaw-

nees; also that Shawnees by adoption, serve on juries grand and petit; that in criminal cases where Shawnees have been defendants, the county has been taxed $674.75 costs, besides other cases not included; by the poll-books, that at the different elections from 1858 to the present, Shawnees have voted in their townships, mostly Shawnees by adoption, but not exclusively so.

It was shown also by J. B. Abbot, that by his records as Indian agent, the lands drawn by adopted Shawnees, as their head-rights, amount to between eight thousand and nine thousand acres; that the department approves deeds of lands from Shawnees to whites. It was admitted that Mathew.King, a Shawnee, voted. It was shown that the pending treaty refers to sales of absentee lands, and to the removal of restrictions on sales of head-rights, also to sale of Black-Bob lands.

It was shown by W. C. Smith that he had for two years taught common school in Monticello township in Johnson county, in a district laid out at request of Shawnees; was paid as other teachers, and that Shawnee children attended, and by G. W. Walker was shown similar facts; and that a Shawnee Indian was a member of the building committee for building the school-house in his district, which embraces Indian lands.

S. B. Myrick and H. W. Cook, were introduced as to cumulative facts. It was admitted that White adopted into the Shawnee tribe, was among the plaintiffs, and that roads were and are laid out through these head-right lands and the lands of adjoining whites, by the state and county authorities.

The above is all the testimony, except that different witnesses repeated the same facts, which repetition has in some cases been omitted.

The court below found the issues joined for the defendants and rendered judgment for the costs against the plaintiffs, and dissolved the temporary restraining order.

A motion for a new trial was overruled. To reverse that judgment the cause is brought to the Supreme Court.

The case was argued by *Wilson Shannon*, for plaintiff, and by *S. O. Thacher*, for defendants in error.

*Shannon*, for plaintiff in error, submitted:

By the treaty with the Shawnees of May 10th, 1854, (10 Stat. at Large, 1053,) the Shawnees conveyed to the United States their reserve, consisting of some 1,600,000 acres, (held by them by patent in fee from John Tyler, President of the United States, of May 11th, 1844; sec. 1, treaty,) and the United States by the same treaty ceded back to the Shawnees 200,000 acres of the same tract for *homes for the Shawnee people*,—lands retained for their benefit, and that of parties to treaties of Aug. 8th, 1831 and Nov. 7th, 1828. The second article provides that these 200,000 acres shall be selected east of the thirty mile line in Kansas, and that selections so made in each case shall include the improvements of each family or individual. Other special selections for schools, churches, &c.. with these, show that it was not the intention of the parties that these Shawnees should be removed, nor that they should be affected in their homes. Each person residing east of that line was to be entitled to two hundred acres, conflicting selections to be determined by priority of improvements, and in such case the party losing, to make selection " *elsewhere adjoining some Shawnee settlement.*" From this it follows that the intent was to keep the Shawnees *together* where they had for thirty years lived undisturbed in their homes, and that a continuance of their tribal organization was contemplated. By this treaty, the Shawnees could select " head-rights " to be held in severalty, or bands could select lands " in common," as they chose ; in neither case could the lands be sold without consent of the government.

It is conceded that the selections thus made " in common," are not subject to taxation by the state. Plaintiff contends that the lands of neither class are.

If these lands are subject to the laws of the state as to taxation, they are in all other respects, and *vice versa.* That they are not in any, without express treaty stipulation, is evidenced by the provision in the treaty, giving the right to lay out roads across these lands (art. 13) without which the local government would have no right therefor.

The ninth article provides that Congress may hereafter provide for the issuing to such of the Shawnees as may make separate selections patents for the same, with such guards and restrictions as may seem advisable for their protection therein. This obligation inures to the Shawnees in a tribal capacity, for the protection of each Indian.

The same authority that could extend the tax laws of the state over these lands would make them liable to levy and sale on execution by order of the Probate Court, by guardians of minors, or taken for public use, and thus to nullify the constitutional action of the government and prevent it from executing its treaties. " A state can pass no law incompatible with constitutional regulations of the federal government in regard to Indian lands."— 1 *McLean,* 265.

March 3, 1859, pursuant to the ninth article of the treaty, Congress provided, (11 Stat. at Large, 430, sec. 11,) "that in all cases where by the terms of any Indian treaty in Kansas territory, said Indians are entitled to separate selections of land and a patent therefor, under *guards, restrictions* or *conditions* for their benefit, the Secretary of the Interior is hereby authorized to cause patents to issue to such Indian or Indians, and their heirs upon such *conditions* and *limitations* and under such *guards* and *restrictions* as may be prescribed by such Secretary."

On the 28th day of December A. D. 1859, the Secre-

tary of the Interior issued to the plaintiff and a number of other members of the Shawnee tribe of Indians who had selected their head-rights under said treaty, patents for the land so selected, with this restriction in the patent: " That said tracts shall never be sold or conveyed by the grantee or his heirs without the consent of the Secretary of the Interior for the time being." This is a guard, restriction or limitation, for the Indian's benefit, pursuant to the act of Congress.

What title does this patent convey? It is not a " fee simple," (4 Kent Com., 4, 5,) nor a " qualified base or determinable fee." (Id., 8.) The Indian has no right to convey without consent of the government. His deed without, would be, not merely voidable, but void, yet his giving a deed would not affect his title to the land under the patent. Nor is this clause therein a " condition " or a " limitation." The latter prescribes the utmost *time* of continuance, the former marks some event which if it happen, will defeat the estate. 4 *Kent Com.*, 146.

The true rule governing this case is this : " The intention of the party to the instrument when clearly ascertained is of controlling efficacy; though conditions and limitations are not readily to be raised by mere inference and argument. The distinctions on this subject are extremely subtle and artificial, and the construction of a deed as to its operation and effect, *will after all* depend less on artificial rules than upon the application of good *sense* and sound *equity* to the object and spirit of the contract in the given case." 4 *Id.*, 153.

The common law definitions then do not apply, but common sense is pre-eminently the criterion to be applied to the *whole patent*. The name we give to the title will not change its nature.

The interest given, a fee simple taking away the power of alienation except, &c., is precisely what always has been called an " Indian title." (6 *Hill*, 546, [*Ogden* v. *Lee*,] af-

41

*firmed,* 5 *Den.,* 628.) The same doctrine is recognized in all the decisions both state and federal.

The government has habitually given such titles prescribing the same disabilities; it is precisely the title that the European governments ever since the discovery of America have conceded to the natives. It was so with England before the revolution, and it has been so ever since, both under the confederation and under the constitution of the United States, and has been practiced by the United States, giving Indians the same title to their *new* homes which they held to their original or native country.

. The second and third articles of treaty of Nov. 7th, 1825, (7 U. S. Stat., 284-5,) and the first, second and eleventh articles of treaty of July 20th, 1831, secured to the Shawnees a tract equal to fifty miles square. *Id., p.* 357.

By the first article of the latter treaty the Seneca and Shawnee Indians residing in Ohio cede, release and quit claim to the United States the lands granted to them by *patent* in *fee simple* by the sixth article of the treaty made at the foot of the rapids of the Miami river near Lake Erie on the 29th day of September 1817. This shows that these Senecas and Shawnees held their land in Ohio by a patent in fee simple, but by reference to the treaty of 1817, it will be seen that they could only sell to or with the consent of the government of the United States. The second article of the treaty of 20th July, 1831, above referred to, grants the lands therein mentioned to the Indians by patent in fee simple to them and their heirs forever, &c. By the eleventh article of the same treaty, (page 353,) the lands granted by said treaty, shall not be sold or ceded by them except to the United States.

By the treaty of the 28th of February, 1831, (7 Stat. at Large, 348-9,) with the Senecas, the Senecas cede by the first article the lands granted to them by patent in fee simple by the sixth article of the treaty made at the foot of the rapids of the Miami river, &c. They also held their

lands in Ohio by a patent in fee simple. By the second article of the same treaty, (p. 349) the Senecas are to be removed west of the Mississippi river, and the government grants them by *patent in fee simple*, &c., their new home. But the twelfth article of same treaty provides that the land shall not be sold by said Indians except to the United States.

Another treaty made with a portion of the Shawnee Indians residing in Ohio, dated August 8th, 1831, (7 Stat. at Large, 355-6-7,) cedes to the United States the lands granted to them by *patent in fee simple* by the sixth article of the treaty made at the foot of the rapids, &c., which shows that they held their land in Ohio by patent in fee simple, &c. The second article of the same treaty grants by patent in fee simple to them and their heirs forever, &c., their new home west of the Mississippi. The tenth article, (page 357,) provides that the lands sold to them shall not be sold or ceded by them except to the United States.

By the treaty made with the Ottawa Indians on 30th day of August, 1831, (7 Stat. at Large, 359, 360,) the third article grants by patent in fee simple to them and their heirs forever, forty thousand acres of land, &c. The ninth article prohibits the sale except to the United States.

By treaty made with the Seneca and Shawnee Indians residing near Lewistown, Ohio, dated 29th of December, 1832, (7 Stat. at Large, 411,) the preamble and the second article show that they held lands under a patent in fee simple both in Ohio and in Kansas, but with the restriction that the land should not be sold or ceded without the consent of the United States.

I refer to these various treaties (and many more might be referred to,) to show what the government has always understood by an Indian title. It is an absolute fee simple with the restriction that the Indian shall not sell except with the consent of the government. What difference is

there between the *patents* under which these various tribes held their land and the patent granted to Charles Blue-Jacket and the other Shawnees who made their selections under the treaty of 10th of May, 1854? Blue-Jacket is an Indian and belongs to the tribe. He selects his head-right from Indian lands because the cession of the two hundred thousand acres to the Shawnees by the treaty of 10th May, 1854, is made to the tribe, and after the cession and before the patents issue to Blue-Jacket and others, no one would say that these lands were not Indian lands.

It is conceded that all the lands that remain of the two hundred thousand acres and held in common or by the tribe, are Indian lands and cannot be taxed. The tribe holds the Black-Bob lands in trust for the Black-Bob band who elected to hold their lands in common. The tribe holds the absentee lands also in trust for the objects specified in the treaty. But the title is an Indian title, and the tribe cannot sell any of these lands except by the consent of the government. It is therefore an Indian title, but Blue-Jacket's title is precisely the same. In both cases the patents are to Indians, and the title taken is identical with the original native Indian title, as conceded by the United States and the English government before us. The only difference in these two classes of patents is that in one case the land is granted by the patents to individual members of a tribe, and in the other the patents grant the land to the tribes in their tribal capacity. To my mind it is absurd to say that in the one case you can tax the lands and extend all the state laws over them, but in the other you can not. Yet no one claims that land held by an Indian tribe under a patent in fee, similar in all respects to the patent of Charles Blue-Jacket, can be taxed by the state. The reason given for this is just as applicable to land held under one class of patents as under the other. So much then for what has been said with so much apparent confidence as to these lands being held by patents in

fee. It is obvious from the treaty itself that it was not the intention of the government to part with the control over these lands except in certain cases where the government might deem it for the interest of the Indian to consent to the sale of them or a portion of them. Allowing the Indians to make selections of head-rights and giving them patents therefor, was done with the view of habituating the Indians to the idea of individual property, and fixing them down to one place and destroying their inclination to roam about and live a hunter's life. To secure these objects and to carry out this policy it was just as necessary for the government to retain the entire control of the property as before the treaty. Indeed without retaining this control the government could not carry out this policy nor fulfill their treaty obligations with the Shawnee tribe of Indians. For these guards and restrictions spoken of in the act of 3d of March, 1859, are intended for the benefit of the Indians, and it is so expressed.

All who know any thing of Indian character and habits would see at once that if these lands are made subject to state laws, that it would require but a short time to sweep every vestige of property from them, leaving them paupers to be supported by the government. And it was precisely to prevent this state of things that the government retained full power over these lands, and rightfully claims and exercises the power of saying whether the Indian may sell any part of his head-rights, and if any part how much, and for what price; that the price shall be adequate, and that the consideration shall be paid in gold or silver. *See instructions of Secretary.*

It would be in vain for the Secretary of the Interior to make these rules and regulations for the protection of the Indians if the state of Kansas could either directly or indirectly set them aside and modify them by subjecting these lands to her local laws.

If these head-rights are subject to our tax laws, they are

subject to our laws in regard to conveying real estate.  By the rules prescribed by the Secretary of the Interior for conveying head-right land the deed must be executed in the presence of two witnesses and acknowledged before the United States Shawnee agent.  All the head-right land sold has been conveyed in this way in conformity to the rules prescribed by the Secretary of the Interior.  These deeds are all void.  An Indian agent has no authority under our laws to take the acknowledgment of deeds.  The principles advocated by the defendants would render void the title to thousands of acres of land in Johnson county, and if adopted would be attended with the most ruinous consequences.

The marriage laws of the state would render nine-tenths of the marriages among the Shawnees void, and the issue bastards.  The evidence shows that Charles Blue-Jacket who is a kind of local Shawnee Indian preacher, has been in the habit for a long time of joining Shawnees in marriage, yet he has no authority under our laws.  He keeps no record of such marriages nor does he transmit a certificate to the clerk of the county as required by statute, yet for every omission he is liable to a penalty of one hundred dollars, to be recovered for the use of the county.  *See Compiled Laws of Kansas, page* 696.

If the doctrine set up in this case is correct that the laws of the state extend over these lands and these people, Charles Blue-Jacket could be prosecuted, judgments for penalties recovered against him, executions issued thereon and levied on his head-right lands, and the same could be sold and the title conveyed to the purchaser by the sheriff's deed.  Under such a ruling of our courts it would not require much time to relieve Charles Blue-Jacket of his head-right lands, and the government of all care and guardianship over the same.  The United States having failed to protect Charles Blue-Jacket in his head-right which was intended for his home, would be bound to support him.  To

avoid this state of things with regard to the Shawnees the government has retained the entire control of the Shawnee lands. Having done this, can the state defeat the object and purpose of the government? *See* 20 *Howard, p.* 564.

The right to tax is a sovereign right, but no more a sovereign right than any other right that belongs to the state. It will not do to say that a state has a right to tax all property within her limits. As a general proposition this may be true but there are many exceptions to the rule. The state cannot tax these various Indian reservations scattered over the state and held by the tribes, yet they are situated within the limits of the state and are embraced within the limits of your counties, and your civil and criminal process, so far as those who belong to our body politic are concerned, may be served on these tribal reservations. The power of the state to tax must be exercised so as not to defeat or impair the exercise of constitutional powers on the part of the federal authorities, and the same may be said of the exercise of any other power on the part of the state. The great principle is that the constitution of the United States and the laws made in pursuance thereof, are supreme; that they control the constitution and laws of the respective states and cannot be controlled by them. *McCulloch* v. *The State of Maryland,* 4 *Wheat.,* 426.

The treaty of the 10th of May 1854, the eleventh section of the act of Congress of the 3d of March 1859, (11 U. S. L., 430,) and the rules and regulations of the Secretary of the Interior made part of the record in this case, are supreme and superior to the laws or constitution of the state of Kansas. No one has questioned their constitutionality.

Congress has the exclusive right to regulate the intercourse with the Indian tribes by the constitution of the United States. In the above case of McCulloch *v.* The State of Maryland, the court sum up the final conclusions they aim at, (page 436-7,) in these words : "That the states

have no power by *taxation* or *otherwise*, to *retard, impede, hinder*, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is we think, the unavoidable consequence of that supremacy which the constitution has declared." The exclusive right of control over these Indians and their lands has upon all occasions been most carefully and expressly reserved by the United States, so as to avoid all claim of a conflicting jurisdiction either on the part of the territories or states. *Comp. Laws* 37, *Organic Act, sec.* 1.

In the act of Congress admitting Kansas into the Union as a state, approved 29th of January 1861, Congress is careful to make the same reservations as to the Indians, their lands and property in the same broad, clear and expressive language. (*Comp. L.*, 75, 76.) This shows that Congress did not intend to surrender to the state any authority or control over the Indians, their lands or property. *See also Act of Admission.*

The state of Kansas has agreed to this act of Congress, and it has become a compact. The state can do nothing to conflict with it; the *right of person* and *right of property*, belonging to the Indians, are in no way to be impaired by the admission of Kansas as a state, or how can the state of Kansas interfere with the *right of property* belonging to the Indian.

Whether the state has made a good or bad bargain, it is too late now to inquire. By taxing these Shawnee Indian lands and selling the same for the non-payment of the taxes and thus passing the title entirely from the Indians, does not the state interfere with the right of property pertaining to the Indian?

There can be but one answer given to that question and the sole ground on which the state claims the right to tax these lands and subject them to her laws generally, is that they are included within her boundary, yet it is provided in the

act of admission that nothing contained in said constitution respecting the *boundary* of said *state* shall be construed to impair the rights of person or property now pertaining to the Indians of said territory, &c. And this interference on the part of the state with the rights of person and the rights of property pertaining to the Indians, is an interference with rights which were vested in these Indians at the time and long before the act admitting Kansas as a state was passed, and therefore they are rights which were expressly protected and intended to be protected by the act of admission. The patents issued to Charles Blue-Jacket and others on the 28th day of December 1859, and the rights of these Indians to these head-rights' were fixed by the treaty of 10th of May 1854, and the patents were authorized by the eleventh section of the act of Congress of the 3d of March 1859. These were rights of property which pertained to these Shawnee Indians at the time the act of admission was passed, and the state by consenting to that act has agreed not to interfere with those rights, and this court will hold her to that agreement.

The facts stated in the petition and proved in the case show that the Shawnee tribe of Indians is an independent nation, subject to their own laws, usages and customs, and owe no allegiance to the municipal laws of the whites. They are dependent domestic nations, but they have never surrendered their right to self-government. See on this point 3 Kent, pp. 507 to 523, and the notes; Worsester *v.* State of Georgia, 6 Pet. U. S. Rep., 515. See the opinion of Marshall and McLane, in this case. See also the case of the Cherokee nation *v.* The State of Georgia, 5 Pet. Rep., p. 1. See the opinion of Chief Justice Marshall, in this case. See the case of Goodel *v.* Jackson, 20 John's Rep., p. 693; 7 John's Rep., 290.

The property and personal relations of Indians subsisting in tribes is not within the jurisdiction of our laws, and letters of administration granted by a surrogate upon

42

the estates of such Indians are *void*. (*Dole* v. *Irish*, 2 *Barb.*, 639.) Distribution of Indian property according to their customs passes a good title. 2 *Barb.*, 639; 3 *Abb. Dig.*, 324.

Indians residing in New York cannot either in their national or individual capacity alien their lands without the consent of the legislature. This was a constitutional provision; all lands held by Indians were considered as held under an Indian title; that is, they had the absolute fee subject to the restriction that they could not alienate their lands without the consent of the state. This is the native Indian title. 7 *Johns Rep.*, 290.

The conveyance of land by an Indian without the consent of the state is void. (20 *Johns Rep.*, 693, *and* 7 *Id.*, *p.* 290.) And this whether he resides with his nation or apart from them, and though he has not expressed his dissent. *Lee* v. *Grover*, 8 *Cow. Rep.*, 189.

The native Indian may purchase, hold and convey lands, and when he becomes a freeholder to the value of $100, is liable on contract, to taxation and to civil jurisdiction as if a citizen. *Laws of N. Y.* 1843, 3 *Abb. Dig.*, 324, (15.)

Up to 1843, the Indians residing in New York, were not subject to the laws of that state; were not taxed either in their lands or personal property; were not subject to their school laws, their laws of marriage and divorce, their road or militia laws, or indeed any of the laws of the state. They were considered independent, domestic nations, owing no allegiance to the state of New York and constituting no part of her body politic. 20 *John's*, 693.

But in 1843, the Indian tribes in that state had become so feeble and incapable of maintaining any kind of a government of their own, that for their protection the legislature assumed the right to authorize them to hold lands and convey the same, and when any of them should become freeholders to the value of $100, then he was made liable

Blue-Jacket v. The Commissioners of Johnson County and others.

on his contract, and to taxation and to civil jurisdiction as if a citizen. The state acting in its sovereign legislative capacity extended their laws with certain qualifications over the Indians residing within the limits of the state. But here the legislature of the state has never attempted to extend the laws of this state over the Shawnee or any other tribe of Indians. Can the officers of Johnson county without any special act of the legislature subjecting the Shawnees to the jurisdiction of the state laws tax either their personal or real property? So long as the United States treats them as an independent tribe capable of entering into treaties and contracts in their national capacity, both the state and the counties must treat them in the same light. It involves an absurdity to say that while the United States treats the Shawnees as an independent domestic nation, the state of Kansas has a right to treat them as a part and parcel of her body politic, and subject to her laws. If the state can do this with the Shawnees, what is there to prevent her from treating all the Indian tribes and all property of Indians living within the boundary of the state in the same manner. This court has already decided that it can make no difference whether these lands are held by individual members of the tribe or by the tribe itself. Whether held by the tribe or individual Indians, they are held by an Indian title—the absolute fee with the restriction as to alienation. This is the Indian title, the title that was conceded to them upon the discovery of the country by the whites, and which by long usage and practice has become the settled law. So long as the land is held by the Indians or by an Indian who is a member of, and living with his tribe, under an Indian title, the United States has the control of the land; they have the exclusive right of preemption if they see proper to exercise it, and no state can directly or indirectly interfere with that right or oust the United States of their control over it.

The right to extinguish the qualified sovereignty of the Shawnee nation must be exercised by the joint co-operation of the United States and the state. This is the opinion expressed by both Marshall and McLane in the above case of Worsester *v.* The State of Georgia. But the question now is how is the judicial branch of the government required to consider the Shawnee tribe of Indians? My answer is, precisely in the same light that they are considered by the executive and legislative branches of the government. Both treat all these Indian tribes residing in the state of Kansas as possessing a qualified sovereignty, owing no allegiance either to the United States (except so far as they have bound themselves by treaty stipulations,) or to the states.

It is the declared law, says Chancellor Kent, of New York, South Carolina and Tennessee, and probably so considered in other states, that Indians are not citizens but distinct tribes living under the protection of the government. 2 *Kent*, *p.* 39.

The question is not whether these Indians reside within our borders or jurisdiction, but whether they form a part of the body politic or people of the state.

We enforce our rights against the Indians not by process of law but by arms. See Marshall's opinion in Worsester's case and Kent's opinion in Goodel *v.* Jackson, 20 Johns,*ante.*

The several local governments before and since the revolution, never regarded the Indian nations within their territorial domains as subjects or members of the body politic, and amenable individually to their jurisdiction. 3 *Kent*, 511; 7 *John's*, 295; 20 *Id.*, 693; *Peak's Tennessee Rep.*, 151.

The map shows that the Indians selected their head rights in a contiguous body so as to include their homes except two small breaks which were probably more by accident than design. The only considerable break in the selections is between those made on the waters of Bull

creek, and the waters running into the Kansas river, and that is not more than one and a half miles. The boundaries of the land selected are irregular, and of necessity had to be so if made according to the treaty, for the treaty required each Shawnee to make his selection so as to include in all cases his home. These Shawnees had been settled by the government on these lands twenty years before, located there as a permanent home. They have almost uniformly settled on the streams and water-courses, and the intention of the government was as is expressed in the treaty to keep them in the same locality. In making selections therefore so as to include their improvements, the aggregate body of land selected would of necessity be an irregular body, but it is all adjoining with the exception of the slight and immaterial breaks mentioned. Although in the new state of things some of the provisions of the non-intercourse act may not be applicable to the Shawnees, yet this two hundred thousand acres selected under the treaty is just as much an Indian country as it was before the treaty. It is the home of the Shawnee Indians, where the government had located them many years before. It is where they have their houses, improvements and families; where their council meet and transact as of yore all their national business. It is where the annuities of the government are paid out, and where they hold their election of officers, and where their national school is kept, and school fund disbursed. It is so far as the Shawnees are concerned, as much an Indian country now as it ever was. Its Indian character is not destroyed because white men have bought land and settled in close proximity to them; nor does it lose its character because they and the whites live in friendly intercourse together or because a white man occasionally marries an Indian woman. If an Indian country could be divested of its Indian character by such slight accidental circumstances, it would be an easy matter to destroy the Indian character of all the Indians residing

in the state. In determining whether this is an Indian country, we are not to look at extraneous circumstances. We are to inquire whether the Indians reside in this country; whether they have their homes there; whether they have their seat of empire there—qualified though it may be; whether the political and executive branches of the government recognize this as the homes of these Indians and transact business with them there as they did before the treaty; whether the government has an Indian agent who transacts his business with the head men and chiefs of the tribe in this locality as in former times. Applying these tests it is obvious that the Shawnee nation has its national existence now where it has had for the last thirty years, and that they so reside in this country under treaty stipulations with the government of the United States and are kept there by the United States, and are under the protection and guardianship of the government just as much and to as great an extent now as they were before the treaty. If these views are correct the principle already established by the court settles this case.

The evidence in the case shows that the Shawnees are an independent tribe and have as complete and distinct a tribal organization now as they ever had, and I think it may be said that their tribal organization is more perfect now than at any former period. They have two chiefs or head men elected by the tribe annually—all males voting over fifteen years of age; they have a council consisting of five, elected in the same way and for the same length of time; they have a clerk of the council and a sheriff or executive officer elected as the other officers are; they have a large school and school fund amounting to five thousand dollars per annum, all managed by this tribal organization under the supervision of the United States. The council act on complaints both civil and criminal, when made to them, and administer justice according to their usages and customs. Their tribal organization and inde-

pendent existence is as fully recognized by the federal government now as at any former period. The government not only transacts business with the tribe now as formerly but treats with them as a tribe, and is now in actual treaty with them for their removal south. A portion of them reside on their head-rights, and another portion live on land held in common, all residing where they had been located in 1832-3 by the government, and on selections made by them under the treaty of 1854, and which selections were approved of by the government. While the lands occupied by the Shawnees, strictly speaking, do not lie in a compact body, they lie mainly in a contiguous body, and just where the government of the United States approved of their location, and where the tribal organization is maintained and has been maintained ever since 1833. Does the sale of a small portion of these head-rights with the approval and under the supervision of the federal authority, to white men, destroy the tribal organization of the Shawnees and subject them and their lands to the exclusive jurisdiction of the state laws? If so, how much of the head-right lands must be sold to produce such a result? Would it follow from one sale or from two; from the sale of one thousand or ten thousand acres? If so, it would be in the power of a few Shawnees owning head-rights to destroy the tribal organization, and extend the state laws over them, against the will of nine-tenths of the tribe and in defiance to the wishes and obligations of the federal government. It might be that if the United States would withdraw from the guardianship of these Indians and cease to exercise any control over them, and the tribal organization become broken up or abandoned and the members of the tribe absorbed by the white population, the state of Kansas would have the right to declare the Shawnees a part of our people and subject to our laws under such limitations as the legislature might think best, just as the state of New York did in 1843. But nothing

of this kind has been done by the state of Kansas, or attempted, and no such state of facts has arisen that would authorize or justify such an exercise of power on the part of the state.

The action of the Probate Court of Johnson county in regard to the partition of real estate held as head-rights, where the original patentee is dead, and the appointment of guardians for minors and a curator or conservator for incompetents, and proceedings authorizing such guardian, curator or conservator to sell the lands held under a head-right, are all with the consent of the government of the United States expressed through the Secretary of the Interior, yet deeds made under a sale ordered by the probate judges, are of no validity until the approval of the Secretary of the Interior is endorsed thereon. *See the rules and regulations of the Secretary of the Interior.*

*Roy & Devenney and S. O. Thacher,* for defendant in error, submitted the following:

1st. There must be a clear and plain infraction of the constitution, or a law, or treaty, made in pursuance thereof, before a court will declare a statute unconstitutional. (*Sedgwick on Stat. Law,* 482.) The author says: That the presumption is that every state statute the object and provisions of which are among the acknowledged powers of legislation, is valid and constitutional; and such presumption is not to be overcome unless the contrary clearly appears. He cites *Fletcher* v. *Peck,* 6 *Cranch,* 128 ; *Ex parte, Mc-Cullum,* 1 *Cow.,* 564; *Morris* v. *The People,* 3 *Denio,* 318 ; *Newell* v. *The People,* 3 *Seld.,* 109 ; *Decamp* v. *Eveland,* 19 *Barb.,* 81 ; *Clarke* v. *The People,* 26 *Wend.* ; *The Sun Mutual Insurance Co.* v. *City of New York,* 5 *Sand.,* 10 ; *Lane et al.* v. *Dorman et ux.,* 3 *Scam.,* 238.

If this is a case of doubt, " every possible presumption and intendment will be made in favor of the constitutionality " of the act in question. *See same authorities.*

This principle of construction we believe to be the correct one in determining this case—it stands on authority and reason.

2d. Of the inherent power in the state to impose taxes there can be no debate. It is admitted by all the authorities. It is an attribute of sovereignty. It is of the same nature as the right of eminent domain. Both belong to the sovereign power. And as a general proposition where one of these powers exists as to any property there the other also may be found. 'They seem to be closely connected, to advance *pari passu*. These propositions are fully sustained in *Blackwell on Tax Titles*, 1; *People ex rel. Griffin* v. *The Mayor of Brooklyn*, 4 *Comstock*, 119, 436; *Providence Bank* v. *Billings*, 4 *Pet.*, 561; *State Bank of Ohio* v. *Knoop*, 16 *How.*, 391; *West River Bridge Co.* v. *Dix*, 6 *How.*, 531.

3d. This right of taxation is never presumed to be surrendered. It can only be lost by positive legislative enactment or compact, or by a treaty clearly expressed. *Providence Bank* v. *Billings*, 4 *Pet.*, 514, 561, 563; *Phil. & Wil. R. R. Co.* v. *Maryland*, 10 *How.*, 393; *State Bank of Ohio* v. *Knoop*, 16 *How.*, 387, 389; *Id.*, 435; *State* v. *Newark*, 2 *Dutch* (*N. J.*) 519; *Indianapolis* v. *McLane*, 8 *Ind.*, 328; *Stein* v. *Mayor of Mobile*, 17 *Ala.*, 234; *Com. Dig.*, 1853, *clause* 60.

The power of taxation is a part of legislative sovereignty; is not subject of contract, or barter, or sale by the legislature. Such a contract on the part of a legislature is a fraud on the sovereignty of the state and void. *Mech. Bank.* v. *Detroit*, 1 *Ohio*, 59; *Id.*, *Toledo Bank* v. *Bond*, 622.

In Massachusetts, Indians are exempt from taxation by a special statute. 3 *Kent*, (10*th Ed.*,) 518, *note b.*

The necessity of an *express* treaty exempting from taxation was recognized in the treaty of Jan. 31st, 1855, between the Wyandotte tribe of Indians and the United States; there is an express provision exempting their lands

43

from taxation for five years after the admission of the state. In the act admitting Kansas into the Union this right of taxation was expressly waived as to the lands of the United States, by express stipulation in section 6, of act admitting Kansas into the Union.

4th. This right of taxation extends to all property and subjects over which the sovereign power of the state extends. The sovereignty of a state extends to that which exists by its own authority or is introduced by its permission. These definitions and descriptions of the objects of taxation, found in McCulloch v. Maryland, 4 Wheat., 528, 29 and 30, cover the entire ground and are recognized as the true tests by all the authorities. *Blackwell on Tax Titles*, 2.

The only limitation as defined in this leading case, upon the power of state taxation is where it attempts to tax the means used, a franchise, or a right granted by the United States, and which are *necessary to carry on* the government. Hence it was held, p. 436, that while the operation of the United States Bank could not be interfered with by taxation yet that its *real estate* was liable to taxation.

That lands sold or conveyed by the United States can no longer be held as " means " for the general government to carry on its operations, was held by Chief Justice Marshal in Weston v. City Council of Charleston, 2 Pet., 468, in which he commented upon McCulloch v. Maryland, *Sedg. Const. and Stat.*, 499; 16 *How.*, 428.

5th. The title of the government to lands passes by patent: until patent the fee is the United States, after patent it is in the grantee, and he may maintain ejectment. *Bagnell* v. *Broderick*, 13 *Pet.*, 450; *Carroll* v. *Safford*, 3 *How.*, 461.

They may even be taxed before patents issue if the United States has received the consideration therefor. 3 *How.*, 463; *citing Lessee of Wallace* v. *Semor & Remich*, 7 *Ohio*, 156; *Douglas* v. *Dangerfield*, 10 *Ohio*, 156.

As to such lands the conveyance of them, whether by deed or by law is subject to the law of the state. 3 *How.*, 462; 13 *Pet.*, 577.

II.  If we inquire what there is to free the lands mentioned in the plaintiff's petition from the control of the above recited principles we must necessarily seek,

1st.  The character of the plaintiffs themselves.  From the evidence it appears that some of them are white men; citizens and voters of the state and county; while others are citizens but not voters.  The law of the territorial legislature, approved Feb. 23, 1860, (chap. 115, Comp. Laws,) made the plaintiffs, who were of Indian blood, citizens of the territory.  Over these territorial laws Congress held supervision and control; this law was never by Congress repealed; it was adopted by our constitution under which Congress admitted Kansas into the Union, and is now as it always has been the law of the state.  So far then as the question of the plaintiffs' citizenship is involved there is not only nothing to show that they are a separate or distinct tribe or people, but both the law of the state, sanctioned by Congress, and the action of the plaintiffs and of the general government as disclosed by the evidence and the letter of instructions from the Secretary of the Interior directing the manner of making sales of lands, unmistakably show that they are citizens of the state, and as such have no right to avoid the duties and obligations imposed upon all the citizens of the state.  They are amenable to the laws of the state in every respect, and the shield of the courts they seek and obtain when needed.  Their lands are subject to descent and distribution according to the state laws; are partitioned like other lands by judicial decrees, and are protected and guarded and sold, when the title to them has fallen to minor heirs, precisely as other lands.  As to all these weighty matters this action of the state law takes effect by the concurrence of the plaintiffs, the state and the general government, so that were the

plaintiffs holding their lands in severalty by patents, yet as a tribal reserve, they would have passed from the jurisdiction of the United States courts and have come under the authority of the state tribunals. *United States* v. *Bailey*, 1 *McLean*, 234; *United States* v. *Cisna*, *Id.*, 254.

In no otherwise are the plaintiffs to be distinguished from the other citizens of the state, save their claim to enjoy all the benefits of civil institutions without bearing any of the burdens incident thereto. Of course if it is so stipulated in the bond, the obligation must be met, but so inequitable a claim must rest on plain, unequivocal compact; it cannot be raised by implication.

As to the suggestion that these plaintiffs have their laws, customs and habits, and usages it proves nothing. So do the Shakers, yet their lands are not withdrawn from the operation of law. They are not thereby a sovereign or independent body. Such a view would sanction the existence of an equally sovereign body within itself by a sovereign state,—a sovereignty within a sovereignty never to be tolerated. *Haight* v. *Keokuk*, 4 *Iowa*, 213.

No state would consent to such a surrender of its vital powers.

The grant was not to the plaintiffs as a tribe but as *individuals*. (4 *Iowa*, 213.) But if the claim of exemption is just, on the ground that at one time the plaintiffs or a part of them were wards of the government, then it simply resolves itself into this: all property held or acquired by Indians, whether native or adopted, is, by such acquisition, freed from operation of state law. Such is the logical effect of the proposition. Nay more, if the claim to exemption rests upon this supposed relation of the Indian to the United States then all the white citizens of Johnson county may procure an adoption into the tribe and thereby secure the same immunity from taxation for their lands.

While it perhaps throws but little light on the question in debate, yet it may be observed that the efforts for sev-

eral years of the government have been to accustom the Indians to the habits and institutions of civilization; the policy of settling them among the whites, and of enabling them to care for themselves has been a fixed one, and this has always eventuated in granting to the individual members of the tribe certain lands thenceforth to be under their own control, freed from tribal or governmental jurisdiction. Of this policy the court will take judicial notice.

Neither is it true that the government treats all the Indian tribes alike—it is regulated by the advance in civilization, by the wealth and necessities of each tribe. Some it keeps and retains in what is called "Indian country," in which all intercourse with the whites is forbidden and a strict seclusion is sought to be established; others are freed almost entirely from the control of the government, their lands are given them in fee simple, their annuities are cut off, and their dependence on the United States no longer continued. Such is the history of the Wyandottes, Shawnees, and many other Kansas tribes. They are placed in the way of entire absorption with the great mass of the citizens of the state. Their treaties were made with reference to the sovereignty of the future state. 4 *Iowa,* 213; *United States* v. *Cisna,* 1 *McLean,* 259 *and* 250.

2d. If we inquire by what tenure these lands are held, we cover the whole ground of their claimed exemption from taxation. The patents are in the usual form, as to the granting portion of all United States patents. The lands are granted absolutely to the patentees—there is no ultimate title in the United States reserved—no right of purchase by the government reserved—they have ceased to be Indian lands—they are not even in a "tribal reserve."

There is the simple personal restriction upon the grantee, restraining him from conveying the estate without the sanction of the Secretary of the Interior. This court has already passed upon the nature and character of that restriction,

and it is only necessary to add that there is nothing in it which withholds these lands from the operation of the state laws.

It was held in Haight *v.* Keokuk; that these treaties were made with reference to the future state

The nature of this restriction was expressly adjudicated in Lowry *v.* Weaver, 4 McLean, 82.

This was a case of lands granted with a restriction to Burnet, in a treaty with the Pottawattamies, at St. Mary's, in 1818. Burnet died intestate, and owing debts; the administrator of his estate sold part of the lands, but refused to proceed further, although there were debts unsatisfied due from the estate, and the suit was brought, among other things to compel the administrator to proceed. In his opinion, Judge McLean comments upon the nature of the restriction, giving it the same character already assigned to it by this court—holding that it was limited to the "personal act" of the grantee and his heirs. But that "the land was not withdrawn from the sovereign action of the state. Like other lands, it may be *taxed* by the state, and is subject by the local law to the payment of debts. This belongs peculiarly to state powers. It regulates the transmission of real estate by deed or by operation of law, and subjects it, in the mode prescribed to the payment of debts. Except by compact or the voluntary legislative action of the state, lands within its limits cannot be withdrawn from its ordinary action."

To this decision given by one of the greatest of American judges, nothing can be added. It seems to cover the entire ground in dispute. It holds that the restriction is nothing more than the restriction upon a minor, or other person incompetent to convey, yet whose estate may be passed by operation of law.

This decision of Judge McLean was examined in manuscript by the Attorney General of the United States, and cited approvingly by him at the conclusion of an elaborate

opinion wherein this question of the nature of the Indian title to patented lands was fully examined. The conclusion he arrived at, is that contended for by the defendants in error. 4 *Opinions Attorney General*, 530,

3d. While to the immediate question before the court, farther argument is useless, yet it may not be valueless to note that while the treaty of 1831 between the Shawnees and the United States granted lands. a portion of which are those in debate, to the tribe as such, and *excluded* them from the boundaries of any future state or *territory*, that of Nov. 2d, 1854, made seven months after the organization of the territory of Kansas, and which organization was made with reference to the future erection of the state of Kansas, entirely dropped the clause omitting these ceded lands from the boundaries of the state. It was the intention of the treaty that these lands should henceforth be in the territory, and in due course of time in the state of Kansas. That this is true, is manifest, moreover, from the clause in the treaty recognizing " the authority of law " in laying out roads through these lands.

This "authority of law " to lay out roads is a recognition of the right of eminent domain in the state. It surely did not intend to imply that highways could be laid, without consent of the owners and without compensation, across the lands of the individual reservees, for this would have been imposing disabilities on the grantees greater than was upon their white neighbors; but it simply recognized the fact of the local jurisdiction as to these lands, and was a tribal consent for the laying out of roads across those lands yet held in common, the fee of which was in the United States.

By a further examination it will be seen that the treaty originally reserved the lands mentioned in the petition to the grantees, but that it was amended by the Senate and subsequently ratified by the Indians so as to make the cession and grant on the part of the United States of the lands

in dispute stand precisely as the grant of other government lands, clearly intending that the parties should hold by the same terms as other government grantees. There was to be nothing in the evidence of the title of the plaintiffs to suggest that they held or could hold their titles different from ordinary government patentees.

These are significant facts, showing just how the treaty itself was understood, its object and design.

As far as possible, it was the manifest intention to allow the plaintiffs henceforth to mingle with, and lose their tribal identity among the people of the state.

And this consummation has been realized. The very fact that so many of the plaintiffs are white men, citizens of the county, that intermarriages between the whites and Indians are numerous, that they use the same schools, respect the marriage laws of the state, and in all respects live with their white neighbors as the whites do with each other, shows that the policy of the government of civilizing and educating the Indians for self-government and free institutions in the case of the Shawnee tribe has proved successful.

4th. As to so much of the act of admission as is embraced in section one, it stands and is to be construed like any other act of Congress.

It does not bind the state, except so far as it is in accordance with the constitution. The propositions submitted in section three of that act, are binding, because assented to by the state. But as to all matters contained in section one, they are of just the same binding force on our state as they would be were they enacted as to any other state in the Union. They were not like the propositions in section three, propounded to the state for its ratification.

The cases of the United States v. Bailey, and the United States v. Cisna, clearly set forth just the powers and limits of the general government over Indian affairs in a state. That power is purely political.

It cannot affect the power of the state over the lands or property within its limits, the control of which it has not released.  17 *Wend.*, 531.

And if it were necessary to the settlement of this question, it could be easily shown that were Congress to pass an act or establish a regulation prohibiting a state from imposing taxes or laying out highways, or exercising any of those essential powers that have never been surrendered by the states to the general government, as to property or land within its limits, such an act would transcend the power conferred on Congress.

But there is no such stipulation in section one, of the act of admission.   Neither is there any right of exemption contracted for, or reserved by treaty with the plaintiffs.

And if the view sought to be enforced by the plaintiffs is the true one, then this right of exemption is one that attaches to the soil—it is a covenant running with the land, and is good in the hands of the grantees of these plaintiffs. *State of New Jersey* v. *Wilson*, 7 *Cranch*, 165.

No such "right" exists as is insisted on by plaintiffs, unless it can be raised by implication, and on this point the authorities are conclusive.

Admitting the binding force of section one, of the act of admission, yet it avails the plaintiffs nothing, for the simple reason that no such right as is set up in this case can any where be shown to have been guaranteed to them.

The cases found in the New York reports depend exclusively upon the local laws of that state.   But even these cases show that the Indians as distinct tribes, living on separate and compact reserves, held in common, and not in severalty are subject to state laws, and to that extent refutes the assumption by plaintiffs that freedom from state law is their right, because of their former or present relations to the general government.   And even in New York, Indians are taxed when worth a certain sum of money.  8 *Cowan*, 189.

From this survey, we may conclude that there being no compact with the state exempting these lands from taxation, and the title to them having passed from the general government, the judgment of the District Court must be affirmed. That if there is any relation between the plaintiffs and the United States, whereby they are not compelled to respond to the demands of the state laws, this does not in any manner bind the state. At most, it suggests an obligation upon the United States to compensate the plaintiffs for the amounts required from them by the state. Such a claim, it is apprehended, would at once be repudiated by the United States, on the ground that there was absolutely nothing to be found in any treaty or regulation, that could by implication, even, raise the presumption for such a claim. The jurisdiction of these lands is somewhere. It is not in the general government—that was parted with long since. It was claimed by the state in one of its earliest decisions, McCracken v. Todd, and as yet has ever been insisted on.

The question is one of much political importance. If there is a sovereign power, such as the plaintiffs claim as inherent in the Shawnee tribe, it goes much farther than a mere exemption from taxation, it is sovereign as to offenses committed, as to enforcement of rights, and redress of grievances arising upon these lands. To state the conclusion is to refute and disprove the premises.

The farther importance of the question is found in the fact, that its decision determines whether those who enjoy the protection of the laws, shall cast the burden of maintaining them upon others. In such a question, it is but natural, that the people of the counties, where these lands lie, as well as the citizens of the state, should take a deep interest.

*By the Court,* CROZIER, C. J.

The questions involved in this case have been twice ably and fully argued at the bar, and the court has given

Blue-Jacket v. The Commissioners of Johnson County and others.

to them much anxious reflection. They are in their na-
ture very important and delicate, involving the ascertain-
ment of the boundary between the powers and functions
of the national and state governments. The case itself is
*sui generis.* The books, so far as the research of counsel,
and a thorough examination by the court have enabled
them to determine, disclosing nothing like it; some of the
principles involved have been adjudicated, and may be
considered as settled and fixed, while others have never
undergone judicial discussion and still remain to be de-
cided from a mass of disquisitions extending over the
whole period from the adoption of the federal constitution
to the present time. Under such circumstances, and con-
sidering the great pecuniary interest, both state and indi-
vidual, to be affected by the decision, it would be the
purest affectation on the part of the court to disclaim all
embarrassment in coming to a conclusion. However much
courts may have been disposed to avoid a determination
of grave questions by seeking for technical grounds upon
which to place decisions in other cases, such a course
in this instance would be wholly inexcusable. The main
question is fairly put and no matter what the embarrass-
ment, must be answered. We shall endeavor to do so.

All the property in the state, except such as is specifi-
cally exempted by the state constitution, and such as is
exempt under the federal constitution and the laws and
treaties made in pursuance thereof, is subject to taxation.
It is not claimed that the property in question is within
the former exemption, but it is claimed that it is within
the latter. The language of the state constitution and of
the act of the legislature made to carry into effect its pro-
visions, is broad enough to include this land as taxable
property, and does include it, unless controlled by para-
mount law. The claim is that it is so controlled. The
federal constitution, the laws of the United States made
in pursuance thereof, and all treaties made under the au-

thority of the United States are the supreme law of the land; and any state law, whether organic or legislative, which shall be in conflict with any of them, must yield to and be controlled by them, as the paramount law; such is the national compact, and no considerations of local policy or notions of state sovereignty can operate to dissolve it. If, in the case at bar, it shall appear that the state authorities are attempting to defeat the constitutional action of the general government, it is as clearly the duty of this court to arrest the farther prosecution of such attempt as it would be for the national court so to do, had the suit been brought therein. If, by the constitution or laws of the United States, or by the treaty with the Shawnees the property in question is exempted from taxation, such exemption must be adjudged to be effectual. The law of the state is, to that extent, controlled thereby. It was the purpose of counsel for the plaintiffs to show that the property was so exempted; and the argument was devoted to the establishing of these two propositions: *First*, the title to the land is in the United States; and *second*, the state has no power to tax the property of the Shawnee Indians. These will be considered in the order stated.

*First.* If the title to the lands be in the United States, they are not taxable. Not only are the lands of the general government exempted from taxation by express stipulation on the part of the state, but without such agreement they would not be liable to be taxed. The rrevocable ordinance of the legislature is merely the expression of what the law would have been without it. What, then, is the nature of the plaintiffs' title? Have the patentees but a portion of the title, the remainder being in the government, or have they the whole title?

The patent in terms conveys the lands in fee simple, and contains a restriction "that said lands shall never be sold or conveyed by the grantee or his heirs without the

consent of the Secretary of the Interior for the time being." It is contended that this gives to the Shawnees nothing more than the ordinary Indian title, *i. e.* the right of perpetual use and possession, the ultimate fee remaining in the government. Where a district of country is held in common by an Indian tribe with or without a patent in fee simple, issued in pursuance of a treaty which does or does not provide that the government alone shall have the right to purchase from them, it has been repeatedly determined that all the title the Indians have to the land is the mere right of perpetual possession and enjoyment. The technical words of the patent or treaty, although sufficient as between individuals, or as between individual white men and the government to convey the absolute fee simple, have in the case indicated the effect stated. The Shawnees, prior to the treaty of May 10th, 1854, held the land ceded by that instrument under a patent containing as strong words of grant as could be found in the legal vocabulary, had the intention been to vest in them the most complete title known to the law; yet under the decision, they took but the mere usufruct, and this much they could not legally convey except to the government, or by the consent of the government. Hence it is argued, although these lands are held in severalty, that because there is a restriction upon the power of alienation by the patentee, without the assent of the government, expressed through the Secretary of the Interior, that the title is the same that the Shawnees have, the mere Indian title, the fee being still in the government. If the fact that these lands are held in severalty cannot affect the question, the position of the counsel is invulnerable. But this would be assuming the very question in controversy.

It is not material to inquire whether the title of the Shawnees would be correctly described by the technical terms, "fee simple." It may be that some of the essen-

tial requisites as applied to conveyances from one individual to another, are wanting. The true test is, what was the intention of the parties, as derivable from the treaty and the provisions of the patent, all taken together, considered with reference to circumstances existing at the time they were made and issued. If that can be ascertained from these sources, it must prevail. Let us see then if it can be discovered. The policy of the government has been to induce the Indians to abandon their mode of life as hunters and warriors, and to cultivate in them a taste for, and aid them in adopting the pursuits and manners of civilization. To this end enlightened missionaries have been encouraged to live among them as teachers, and the vicious of the white race, have, so far as was practicable, been excluded from their country. They have been furnished with agricultural implements and taught the use of them. Traders and merchants have been permitted to live among them and furnish them with supplies, so that they need not depend upon the spoils of war, or rely upon the uncertain success of the chase for the necessaries of life. The white race became too strong for them to cope with in war, and it was inevitable that it would soon spread itself over the country occupied by the Indians, thereby destroying its characteristics as hunting grounds, the result of which would be, that the red men must either learn to extract a subsistence from the soil or become a race of squalid paupers. Hence the propriety of the course pursued by the government in regard to these people. The effect of this policy is seen in many instances. The nationalities of some of the tribes most ferocious in history has become extinct, the members thereof constituting a worthy portion of the great body politic, undistinguishable from the great mass, except in color of texture. They may, with many keen regrets, look back to the palmy days of their national glory, when they were the owners and independent rulers of a conti-

nent, deploring with deep sorrow their present humble condition; yet however much we may honor such patriotic emotions, we cannot wish the situation otherwise.

The same policy is still being pursued by the government; and who can doubt its object or result. Its earmarks are distinctly visible in the treaty with the Shawnees. They constitute no exception to the general rule. Their rise in civilization, is surely at best, slowly working the destruction of their nationality. Nationally considered they are being "killed with kindness." Can it be doubted that the treaty of May 10th, 1854, was intended as a step forward in the business?

The Shawnees, for the last third of a century have lived upon the very borders of civilization, and much of the time in actual contact with the white race. Many of them have been gradually losing the distinctive characters of the red man, adopting the habits and modes of life of their fairer-skinned neighbors, and are, and have been for years thrifty, substantial industrious husbandmen. On the other hand, others of them still live the nomadic lives of their fathers; preferring to remain in habits, mode of life and in name, Indians. Attrition with the white race has not operated to polish down the roughness of their original rude character. Labor is their horror, and thrift and comfort are alike despised. In the country ceded by them by the treaty of 1854, the former class, under tribal regulations, were occupying particular portions of their country, having made thereon farms and other improvements, pertaining to a fixed mode of life. Their reservation would soon be surrounded by white settlements and be useless to the nomadic portion as hunting grounds. There was vastly more of it than would be necessary for agricultural purposes if every member of the tribe were to become an independent tiller of the soil. If suffered to remain in its then condition, it must continue to be a vast waste in the most desirable part of the territory the

government was then about to open to settlement, unrelieved but by the scattering improvements of the more thrifty. Good policy dictated that the portion of these lands which under the circumstances must soon become wholly useless to the Indians as a home, should be placed in a situation to be occupied by the whites. Upon consultation with the Indians, it was ascertained that their views and those of the government coincided, and immediate steps were taken for an amicable arrangement. It was the opinion of the Shawnees that one-eighth of the lands they were occupying, would under the circumstances then surrounding them, and in view of the inevitable condition of things in the immediate future, be sufficient for their purposes. This would be about two hundred acres for each member of the tribe. Some of them desired to hold their portions in severalty, others in common; and others still, who were incompetent to determine for themselves, or absent, were to be provided for. The remaining fourteen hundred thousand acres they were willing the government should have at a fair price, and to carry into effect these views the treaty of May 10th, 1854, was made.

By that treaty the Shawnees cede to the United States the whole of their reservation containing about sixteen hundred thousand acres, in consideration of which the government re-cedes to them two hundred thousand acres, and promises to pay them eight hundred and twenty-nine thousand dollars in money. These two hundred thousand acres were to be selected, except in a few instances, within thirty miles of the Missouri line. It was competent for the Indians, had they seen proper so to do, to have selected the whole in a compact body and held them in common. Had they done so, no patents would have been issued to them, and their title would have been at least the Indian title as above defined. But it was not expected that course would be taken by them. It is ap-

parent from the provision of the treaty, that some of them desired to hold their shares in severalty, and that such arrangement was in accordance with the views of the government, and the sequel shows that result to have been realized. Among the more civilized and thrifty of them such a desire was a very natural one. If they by their skill and industry should make, or had made the portion they occupied more desirable and more valuable, they, as against the trifling and indolent portion of the tribe, would be equally entitled to the resulting benefits. This could but be accomplished by their holding their shares in severalty, and such was the course they pursued. When the Indian, in pursuance of the treaty, made his selection of lands to be held by himself in severalty, the title of the tribe, so far as the lands selected were concerned, vested in him. That is, he took the right of perpetual use and occupation. Had it been the intention of the framers of the treaty that he should not acquire a greater title, further provision was wholly unnecessary, but further provision was in fact made. The tribe agreed that under proper restrictions for the protection of the patentees, the government might issue patents for the lands. What was the object of this provision? It was not to enable the government to convey the ultimate title. That it would have a right to do without the consent of the tribe. It was competent, however, for them to agree that when it should be done, it should be done in such manner as to afford proper protection to the Indian in the enjoyment of his lands. It was feared, probably, that some of the patentees might be overreached by their more shrewd and better educated white neighbors, and be deprived of their lands without adequate compensation. Hence the propriety of the stipulation referred to. No time was fixed for the issuing of the patents. The government could select its own time. It was bound to nothing except, that when it did take action in the premises, it should see that

the Indians were properly protected. In a little less than five years from the date of the treaty, viz : on the 3d of March 1859, Congress provided for issuing the patents ; we have already found that from the time the selections in severalty were made, the individual Indians had the Indian title to the lands so selected ; patents were not necessary to vest in them that title, something else must have been intended. It cannot be presumed that nothing whatever was intended to be accomplished by the solemn act of Congress in providing for the issuing of patents, and the equally solemn action of the executive department of the government in issuing them. Nothing remained in the government but the ultimate titles and the ordinary mode adopted by the government for conveying that to individuals is by patent in fee simple. Must not the conclusion then, be irresistible and that the object of these patents was to convey to the Indians the ultimate title ? It seems so to the court. But the correctness of this conclusion is confirmed by the fact, that when any of these lands are sold by the grantees, with the consent of the government, the whole consideration of the sale goes to the Indian.

In all this the general policy of the government as hereinbefore indicated, is exemplified in a striking manner. Those of the Shawnees who had become partially civilized, were to be placed in situations favorable to further advancement, it not being doubted on the part of the government that they would still progress in that direction and soon be in a condition to dispense wholly with its guardianship.

The effect of the restrictions in the patent remain to be considered. It need not be argued that it does not operate as a condition; an attempt by the Indian to convey without the assent of the Secretary of the Interior does not forfeit his right to the land. His act would be wholly void, not affecting his title in any way. It is not a

limitation upon the title, because we have seen that the whole title of the government passed when the patent issued. In a like case Justice McLean held that the restriction operated to place upon the Indian a personal disability similar to that imposed by law upon a minor. (*Lowry v. Weaver*, 4 *McLean*, 82.) Were it not for this restriction there being no other prohibition, Charles Blue-Jacket might convey his land and his grantee would take the absolute title. (*Doe v. Wilson*, 23 *How.*, 457.) To deprive him of that power with reference to his individual property, an express prohibition was necessary, and it was competent for the government to provide that it might be inserted in the patent. The government having so provided, and the patents having been issued accordingly the prohibition is effectual  The conclusion of the court upon the first point is that the absolute title to the lands in question was intended to be and is in the Indians and not in the government, and that they must be held to be taxable if there be no other reason for adjudging them exempt.

*Second.* Are these lands exempt from taxation on the ground that they belong to Shawnees ?  The record shows that for some purposes at least the tribal organization of the Shawnees is still maintained, but it no where appears neither from the treaty nor the record that as a tribe they have a right to, or that they attempt to control in any manner the lands held in severalty by the patentees. The record also shows that the lands not only do not lie in a compact body, but that they are widely scattered, being thickly interspersed with the lands and settlements of white persons, nor did the treaty require or contemplate that the selection of lands to be held in severalty should be contiguously made. Those who already had made for themselves homes were authorized to make selections including them, but were not compelled to do so; only those who desired to hold their lands

in common were required to make contiguous selections. It may have been the result of design that the selected lands came so nearly forming a compact body, but it was not in consequence of any requirement to that end, and had it been so, it was not contemplated that it would so remain. What has in fact occurred, must have been expected to transpire, to-wit: that some of the grantees would desire to dispose of some of their lands, which when permitted, must inevitably break the continuity. But it is no matter now what the intention was, the fact is that the lands owned by the Indians in severalty do not lie in a compact form.

Having premised this much, we will proceed to an examination of the legal question involved.

There is no express prohibition against taxing these lands, or the personal property of the Indians residing upon them. The treaty does not contain it, nor is it contained in any act of Congress to which our attention has been directed. In disposing of these lands to the Indians, it doubtless was competent for the proper branch of the government, under the powers to make needful rules respecting the territory of the United States, and to regulate commerce with the Indian tribes, conferred by the federal constitution, to have prohibited their taxation by the state, at least so long as they might remain the property of the members of an Indian tribe. The exercise of such power in this instance must be sought elsewhere than in express provisions of law or treaty. The court has been referred to judicial decisions in the state of New York, as establishing and illustrating the proposition contended for, and especially to that in the case of Goodall v. Jackson, 20 Johnson, 693. The opinion of Chancellor KENT in that case is a very elaborate, and doubtless exhaustive one upon the questions he discussed. But there is no similarity between that case and the one at bar. The ultimate title to the lands occupied by the Indians in

New York never was in the general government, but from the adoption of the federal constitution until disposed of by state regulations, remained in that state. It alone had the right to extinguish the Indian title. Various constitutional and statutory provisions had been made and enacted upon the subject of acquiring this title, and in relation to the conduct of the whites towards the Indians; and the argument of Chancellor KENT was for the purpose of showing the policy of that state with reference to the lands and other affairs of the Indians within its limits. The case arose under, and was governed exclusively by the constitution and laws of the state of New York. The constitution and laws of the United States had nothing whatever to do with it, so that, so far as the case at bar is concerned, very little can be learned from a perusal of his opinion. He demonstrates very conclusively that the Indians had always been left perfectly free to regulate their own internal affairs in their own way, and that the state had never attempted to make its laws applicable to them or their affairs in their homes, but he does not show how far the state might legally have gone, had she chosen to exercise her powers in that direction. Upon that subject the opinion is perfectly silent. Because the State of New York did not attempt to make her laws applicable to the Indians or their affairs there, it can not follow that, under some circumstances, this state might not lawfully do so here; we do not, therefore, regard this case as being at all in point. The court has also been referred to a number of cases decided by the Supreme Court of the United States, among which are the Cherokee Nation v. Georgia, 5 Pet., 1, and Worcester v. Georgia, 6 Id., 515. We should feel bound by the decisions in these cases, and would implicitly follow them, did we conceive them to be applicable to the case at bar. That they are not, must be apparent from even a hasty examination. The Cherokees held their lands in common. They occu-

pied a district of country, the boundaries of which were accurately and distinctly defined; and in the exclusive occupancy thereof, the general government by treaty stipulations had guaranteed them its protection; it was not alone because the Cherokees were an Indian tribe that it was held that the laws of Georgia could have no application to them or their affairs. But it was so held because they were recognized by the general government occupying exclusively a district of country, in the enjoyment of which they were promised the protection of the United States. In the latter case the court say (page 557,) the treaties and the laws of the United States contemplate the Indian territory as completely separate from that of the states."

In the case at bar some of these conditions are wholly wanting. The Shawnees do not hold their lands in common, nor are they contiguously located. It is difficult to conceive of a national existence without a national domain upon which to maintain it. Two independent governments, in the same sphere, existing in the same locality, would be rather anomalous. It may be competent for the general government for some purposes, to recognize the continued tribal existence of the Indians, but it never has recognized them as distinct nationalities except in connection with the country they occupied. It never has treated with them or legislated in regard to their affairs, except as the owners and exclusive occupants of a particular district of country. The intercourse laws were made to apply to them only as Indians belonging to a tribe recognized and treated as such by the government which presupposes their existence as a distinct race, owning and governing a particular district of country. The Shawnees who own and occupy these selected and patented lands are in precisely the same situation they would have been, if instead of giving them two hundred acres of land apiece, the government had given each two

hundred dollars which they had used in purchasing each a quarter of a section of the public lands wherever it could be found within the state. In such a case it must be apparent, that the decisions referred to could have no applicability.

Again, it is claimed that upon consideration of the treaty itself it is apparent these lands were not to be taxable. It has been already observed that there is no express provision exempting them. But it is argued that because these were ceded to be occupied as homes for the Shawnees, and were not to be sold without the consent of the government, the manifest intention was that they should not be subject to taxation. An examination of treaties made with other tribes by the same commissioner on the part of the United States, and about the same time, may throw some light upon the subject.

Between the 15th of March 1854, and the 27th of February 1855, George W. Manypenny, Esq., as commissioner on the part of the United States, made treaties with the Otoes and Missourios, the Omahas, the Shawnees, the Iowas, the Sacs and Foxes, the Kickapoos, the Kaskaskias, the Miamis, the Wyandottes, the Chippewas and the Winnebagoes, all of them, as will be apparent from a perusal thereof, must have been written by one person, or the subsequent ones copied from the first one. The language used is similar in all of them, and they all contain provisions with reference to the issuance of patents for land in severalty. In the treaties with the Otoes and Missouries, and with the Omahas, the language is, " The President may * * * issue a patent to such person or family for such assigned land, conditioned that the tract shall not be aliened or leased for a longer term than two years, and shall be exempt from sale or forfeiture."

With the Shawnees, " Congress may hereafter provide for issuing to such of the Shawnees as make separate selections, patents for the same with such guards and re-

strictions as may seem advisable for their protection therein." With the Iowas, "Congress may hereafter provide for the issuing to such persons patents for the same, with guards and restrictions for their protection in the possession and enjoyment thereof."

With the Kickapoos and the Sacs and Foxes, "The lands thus assigned may hereafter be confirmed by patent to the parties or their representatives, under such regulations and restrictions as Congress may prescribe."

With the Kaskaskias, "Patents for the lands selected by or for individuals or families may be issued subject to such restrictions respecting leases and alienation as the President or Congress of the United States may prescribe."

With the Miamis, "The President may cause patents to issue to single persons or heads of families for the lands selected by or for them, subject to such restrictions respecting leases and alienation as the President or Congress of the United States may impose, and the lands so patented shall not be liable to levy, sale, execution or forfeiture."

With the Wyandottes, "None of the lands thus assigned and patented to the Wyandottes, shall be subject to taxation for a period of five years from and after the organization of a state government over the territory where they reside, and those of the incompetent classes shall not be aliened or leased for a longer period than two years, and shall be exempt from levy, sale or forfeiture, until otherwise provided by state legislation, with the assent of Congress."

With the Chippewas, the President may "issue patents to them for the tracts so assigned to them, respectively; said tracts to be exempt from taxation, levy, sale or forfeiture, and not to be aliened or leased for a longer period than two years at one time, until otherwise provided by the legislature of the state in which they may be situated, with the assent of Congress. They shall not be sold or

aliened in fee, for a period of five years after the date of the patents, and not then without the assent of the President of the United States being first obtained."

With the Winnebagoes, the same as with the Chippewas, except that the time within which the lands may not be sold, is extended to fifteen years.

Within the time above mentioned, treaties were made with the Calapooias and Willamettes, and although not negotiated by Mr. Manypenny, yet executed while he was Commissioner of Indian Affairs, which contain provisions similar to that contained in the treaty with the Miamis. The congressional action contemplated by the treaties with the Shawnees, the Iowas, the Kaskaskias, the Kicapoos and the Miamis, is found in the act of March 3d, 1859, and is in these words:

"That in all cases where, by the terms of an Indian treaty in Kansas territory, said Indians are entitled to separate selections of lands, and to a patent therefor under guards, restrictions, or conditions for their benefit, the Secretary of the Interior is hereby authorized to cause patents therefor to issue to such Indian or Indians, and their heirs, upon such conditions and limitations, and under such guards or restrictions as may be prescribed by said Secretary."

The treaties may be divided into four classes: 1st. Treaties which contain no restrictions whatever; 2d. Those which prohibit alienation by the Indians without the assent of the government; 3d. Those which exempt the lands from liability to levy, sale, execution or forfeiture; and 4th. Those which in addition to all this, expressly exempt lands from taxation. Now, in the first class mentioned, it is very plain the treaties contain no exemption of the lands from taxation. Whether that should be done was left wholly in the discretion of Congress, and was by Congress transferred to the Secretary of the Interior. In the second class the treaty itself contains a prohibition

46

against alienation by the grantee. In the third class the prohibition, in terms goes further, extending to levy, sale or forfeiture ; and in the fourth class the word "taxation" is added to the terms in the preceding class. Now is it at all probable that Mr. Manypenny meant no more by the expression used in the fourth class than those employed in the second and third classes? The treaties of the first three classes had been negotiated by him and executed when those of the fourth class were drawn. Can it be that he meant nothing by the deliberate addition of the word "taxation," or is it to be presumed that the President and Senate of the United States regarded it as an idle word? If the Commissioner, the President and the Senate understood the terms of these treaties which prohibit alienation to impart an exemption from taxation, is it likely the one would have deliberately inserted it, and that the others would have sanctioned its use? We think not. Mr. Manypenny manifestly intended to prohibit what he supposed had not been provided against in the second class at least. If he had considered a prohibition against alienation by the Indians a sufficient guaranty against taxation, he would not have added the exemption in terms. That such was his understanding is very manifest from the provisions of the treaty with the Wyandottes. The Wyandottes were divided into two classes; those that were competent to take charge of their own affairs, constituted one class, and those not so competent were included in the other class. Patents conveying the absolute title, without restriction were to be issued to the first class. The patents to be issued to the other class were to contain an express condition that the lands were not to be sold for five years, and not then without the express consent of the President. The treaty further provides that the lands of neither class should be taxed for five years after the organization of the state government which should include them. A special prohibition was necessary

Blue-Jacket v. The Commissioners of Johnson County and others.

to exempt the lands of the first class, but it was not necessary to extend it to those of the second class if they had considered the restrictions upon the power of alienation sufficient to that end. And more than that : he very manifestly intended that notwithstanding the restriction might continue longer than five years after the organization of the state, the lands were not for a greater length of time to be exempt from taxation, so that, taking the whole provision together, the commissioner did not consider the restriction upon the power of alienation, suffi· cient to exempt the property from taxation. Again : under the authority vested in him by the act of Congress, it was competent for the Secretary of the Interior in issuing the patents to the Shawnees to have exempted the lands from taxation. He was given the absolute control of the subject. He was doubtless familiar with the treaty stipulations we have been considering, and must have been convinced that there was at least room for a doubt as to the efficacy of a simple restriction upon the power of' alienation as an exemption from taxation. Being so convenient, had he intended that these lands should not be subject to taxation, he would probably have removed all doubt by inserting a provision to that effect in the patent, not having done so, the inference under the circumstances that he did not intend the lands to be exempt, is a fair one.

If the lands of the Shawnees are not exempt from taxation, it is unnecessary to argue that the personal property of the Indians residing thereon is not. We think, therefore, that the correctness of the second proposition, to-wit : that the state has no power to tax the property of these Shawnees, is not vindicated by the decision of the courts of New York or of the Supreme Court of the United States. We also think that the treaty with the Shawnees, the act of March 3d, 1854, and the action of the Secretary of the Interior in pursuance thereof, were considered in the light of the contemporaneous action of the govern-

ment, and show that it was not the intention that these lands should be exempt from taxation.

Our conclusion then, upon the whole case is, that the Shawnees who hold their lands in severalty under patents from the government, have the abstract title thereto; that the lands are subject to taxation unless exempted specifically by the constitution of this state, or by some paramount law, and that they are not so exempt.

In this conclusion we are sustained by the decision of Justice McLEAN, in the case of Lowry v. Weaver, already referred to. That was a proceeding to subject to sale for the payment of his debt, the lands of an Indian chief who held them under a patent containing a restriction that they should never be aliened by the grantee or his heirs without the consent of the President of the United States. In his opinion the judge said that by the restriction "the land was not withdrawn from the sovereign action of the state. Like others it may be taxed by the state. * * * This belongs peculiarly to state powers. * * * Except by compact or the voluntary legislative action of the state, lands within its limits cannot be withdrawn from its ordinary action."

The judgment of the court below will be affirmed.